1 | Paul S. Jasper, Bar No. 200138
Amir Gamliel, Bar No. 268121
2 | PERKINS COIE LLP
505 Howard Street, Suite 1000
3 | San Francisco, CA 94105
Telephone: 415.344.7000
4 | Email: PJasper@perkinscoie.com
AGamliel@perkinscoie.com
5 |
Andrew H. Sherman (admitted *pro hac vice*)
6 | Boris I. Mankovetskiy (admitted *pro hac vice*)
SILLS CUMMIS & GROSS P.C.
7 | One Riverfront Plaza
Newark, New Jersey 07102
8 | Telephone: 973.643.7000
Email: ASherman@sillscummis.com
9 | BMankovetskiy@sillscummis.com

10 | *Co-Counsel to the WHC Liquidation Trust*

11 |

12 | **UNITED STATES DISTRICT COURT**

13 | **NORTHERN DISTRICT OF CALIFORNIA**

14 | **SAN JOSE DIVISION**

15 |

16 | JEREMY ROSENTHAL, as Liquidation
Trustee of the WHC LIQUIDATION TRUST,

17 |     Plaintiff,

18 |

19 | v.

20 | HALSEN HOLDINGS, LLC, a California
limited liability company; SOUTH TEXAS

21 | ASSOCIATES & RESOURCES, a California
corporation; PENINSULA HEALTHCARE

22 | MANAGEMENT LLC, a Nevada limited
liability company; DANIEL BROTHMAN, an

23 | individual; EDITH BROTHMAN, an individual;
STACY SEAN FOWLER, an individual;

24 | EDMUND C. KING, an individual; and DOES 1
through 100, inclusive,

25 |

26 |     Defendants.

27 |

28 |

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jeremy Rosenthal, as Liquidation Trustee of the WHC Liquidation Trust ("Plaintiff"), files this complaint (the "Complaint") against the above-captioned defendants and alleges as follows:

## I.      SUMMARY OF COMPLAINT

1.      The Debtors (as defined below) operated Watsonville Community Hospital (the "Hospital"), a 106-bed acute care facility located in Watsonville, California, before ultimately selling the Hospital during the course of their bankruptcy to the Pajaro Valley Healthcare District Project.

2.      During the time the Debtors operated the Hospital, defendants Daniel Brothman, Stacy Sean Fowler, and Edmund C. King (collectively, the "Halsen Executives"), aided and abetted by the other named defendants, grossly mismanaged the Hospital and engaged in a series of grossly negligent and/or self-interested actions, and inactions, that caused WHC (defined below) to be insolvent from the start of their stewardship as sole board members and officers.  Their oversight, or lack thereof, also resulted in a continually worsening economic catastrophe that became so severe that it ultimately precipitated the Debtors' commencement of chapter 11 bankruptcy cases.[1]

3.      Meanwhile, during the four-year period preceding the December 5, 2021 bankruptcy filing date (the "Petition Date"), the Halsen Executives caused the Debtors to transfer at least $3,965,560 to, or for the benefit of, themselves and other Defendants, who are either close family members or friends of the Halsen Executives, or entities owned or controlled by and/or the alter egos of, one of or more of the Halsen Executives (collectively, as set forth on Exhibit A, the "Transfers").

4.      The Halsen Executives attempted to conceal the Transfers as legitimate business expenses notwithstanding that, as to each of the Transfers, payment was made either (a) without consideration, (b) to satisfy a financial obligation of Defendants where the Debtor that made the Transfer did not have any shared liability, or (c) to take advantage of the Halsen Executives'

---

[1] The Debtors' bankruptcy cases are jointly administered in the United States Bankruptcy Court for the Northern District of California, San Jose Division, under *In re Watsonville Hospital Corporation. et. al.*, Case No. 21-51477. The Debtors other jointly administered cases are: *In re Watsonville Healthcare Management, LLC*, Case No. 21-51478; *In re Watsonville Hospital Holdings, Inc.*, Case No. 21-51479; and *In re Halsen Healthcare, LLC*, Case No. 21-51480.

positions as WHC's sole directors and officers to enrich themselves while the Hospital they managed was insolvent, starved for cash, delaying (or failing to make) payments owed to creditors, and sinking further and further into grave financial distress.

5.      As set forth below, the Halsen Executives repeatedly breached their fiduciary duties owed to WHC by engaging in self-dealing and failing to comply with the most basic requirements of corporate governance.

6.      The Halsen Executives breached their fiduciary duties with the aid, assistance and support of each of the other Defendants.

7.      Each of the Defendants was the recipient of one or more fraudulent transfers that were directed by the Halsen Executives with fraudulent intent, including efforts to disguise the purpose of such transactions to provide the appearance that they were payments of legitimate business expenses.

8.      The Trustee brings this action on behalf of the Debtors, their Estates, and/or their creditors, seeking the entry of a judgment, among other things: (i) avoiding and recovering the Transfers made by the Debtors to or for the benefit of one or more of the Defendants pursuant to 11 U.S.C. §§ 544, 548, 550 and applicable state law; (ii) imposing liability on each of the Halsen Executives for breaching their fiduciary duties owed to WHC and its stakeholders; (iii) imposing liability on all of the Defendants for aiding and abetting a breach of their fiduciary duties; (iv) declaring that (a) the Halsen Executives and Halsen Holdings, (b) Fowler and South Texas Associates, and (c) King and Peninsula Healthcare are each alter egos of the other and accordingly piercing the corporate veil; (v) granting the Trustee equitable relief as requested herein; and (vi) granting the Trustee such other and further relief as may be just and proper.

## II.      JURISDICTION AND VENUE

9.      On December 5, 2021 ("Petition Date"), Watsonville Hospital Corporation ("WHC") (Bankr. N.D. Cal., Case No. 21-51477), Watsonville Healthcare Management, LLC ("WHM") (Bankr. N.D. Cal., Case No. 21-51478), Watsonville Hospital Holdings, Inc. ("Watsonville Holdings") (Bankr. N.D. Cal., Case No. 21-51479), and Halsen Healthcare, LLC

("Halsen Healthcare") ( Bankr. N.D. Cal., Case No. 21-10531) each commenced a bankruptcy case (each a "Chapter 11 Case" and, collectively, the "Chapter 11 Cases") under Chapter 11 of the United States Bankruptcy Code by filing a voluntary petition for relief in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"). WHC, WHM, Watsonville Holdings, and Halsen Healthcare are each referred to as a "Debtor" and, collectively, the "Debtors".

10. This Amended Complaint seeks the entry of money judgments against the Defendants.

11. This action arises in and relates to the Debtors' Chapter 11 Cases now pending in the Bankruptcy Court. Accordingly, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

12. The Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 because it arises under the laws of the United States.

13. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**III. PARTIES**

14. Plaintiff is the liquidation trustee for a liquidation trust established pursuant to that certain Liquidation Trust Agreement, dated September 7, 2022, by and between the Debtors and Jeremy Rosenthal of Force Ten Partners, LLC, as Liquidation Trustee (the "Liquidation Trustee" or "Trustee") under that certain *Modified First Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors* dated July 18, 2022 [Docket No. 616] (as amended, modified, and/or supplemented, the "Plan").

15. Defendant Daniel Brothman ("Brothman") is an individual who, upon information and belief, resides at 1872 Sharon Lane, Santa Ana, CA 92075. Among other things, Brothman is the former Chairman of the Board and Secretary of WHC and, upon information and belief, a member of Halsen Holdings.

16. Defendant Edith Brothman ("Edith") is an individual who, upon information and belief, resides at 1872 Sharon Lane, Santa Ana, CA 92075. Among other things, Edith is

Brothman's wife.

17.    Defendant Stacy Sean Fowler ("Fowler") is an individual who, upon information and belief, resides at 24 Cayman Court, Manhattan Beach, CA 90266.  Among other things, Fowler is the former Chief Executive Officer, and a former member of the board, of WHC and, upon information and belief, a member of Halsen Holdings (defined below).

18.    Defendant Edmund C. King ("King") is an individual who, upon information and belief, resides at 5351 N. Eagles View Dr., Lehi, UT 84043.  Among other things, King is the former Chief Financial Officer and member of the board of WHC and, upon information and belief, a member of Halsen Holdings.  (For purposes of this complaint, Brothman, Fowler and King are referred to, collectively, as the "Halsen Executives").

19.    Defendant Halsen Holdings, LLC ("Halsen Holdings") is, on information and belief, a limited liability company organized in California, with a principal address of 1872 Sharon Lane, Santa Ana, CA 92075.  On information and belief, (a) Halsen Holdings holds, directly or indirectly, 100% of the equity interests of each of the Debtors and (b) Brothman, Fowler and King are among its members.

20.    Defendant South Texas Associates & Resources ("South Texas Associates") is, on information and belief, a corporation formed in California, with a principal address of 24 Cayman Court, Manhattan Beach, CA 90266.  On information and belief: (a) South Texas Associates is owned and controlled by Fowler.; (b) there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Fowler and South Texas Associates such that any individuality and separateness between Fowler and South Texas Associates has ceased, and South Texas Associates was, at all relevant times, and is, the alter ego of Fowler in that Fowler generally used South Texas Associates' assets for his personal uses without maintaining corporate formalities or separateness; and (c) Fowler completely controlled, dominated, managed, and operated South Texas Associates and intermingled its assets with his own to suit Fowler's convenience and did so to evade payment of the obligations owed to creditors of South Texas Associates and to defraud Plaintiff.

21.     Defendant Peninsula Healthcare Management LLC ("Peninsula Healthcare") is, on information and belief, a limited liability company organized in Nevada, with a principal address of 5351 N. Eagles View Dr., Lehi, UT 84043.  On information and belief: (a) Peninsula Healthcare is owned and controlled by King; (b) there exists, and at all times herein mentioned there existed, a unity of interest and ownership between King and Peninsula Healthcare such that any individuality and separateness between King and Peninsula Healthcare has ceased, and Peninsula Healthcare was, at all relevant times, and is, the alter ego of King in that King generally used Peninsula Healthcare's assets for his personal uses without maintaining corporate formalities or separateness; and (c) King completely controlled, dominated, managed, and operated Peninsula Healthcare and intermingled its assets with his own to suit King's convenience and did so to evade payment of the obligations owed to creditors of Peninsula Healthcare and to defraud Plaintiff.

22.     On information and belief:  (a) There exists, and at all times herein mentioned there existed, a unity of interest and ownership between the Halsen Executives, on the one hand, and Halsen Holdings, on the other hand, such that any individuality and separateness between the Halsen Executives and Halsen Holdings, and each of them, have ceased, and Halsen Holdings was, at all relevant times, and is, the alter ego of the Halsen Executives in that the Halsen Executives generally used Halsen Holdings' assets for their personal uses without maintaining corporate formalities or separateness; and (b) the Halsen Executives completely controlled, dominated, managed, and operated Halsen Holdings and intermingled its assets with their own to suit the Halsen Executives' convenience and did so to evade payment of the obligations owed to creditors of Halsen Holdings and to defraud Plaintiff.

**IV.     THE CHAPTER 11 CASES AND FORMATION OF WHC LIQUIDATION TRUST**

23.     On July 28, 2022, the Court entered the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and Official Committee of Unsecured Creditors* (the "Confirmation Order") [Docket No. 647], confirming the Plan.  The Plan became effective on September 9, 2022 (the "Effective Date").

24.     On the Effective Date, the Trust was established and Jeremy Rosenthal was appointed the Liquidation Trustee.  Pursuant to Article V.G of the Plan, on the Effective Date, the Liquidation Trustee was deemed the representative of the Debtors' bankruptcy estates in accordance with section 1123 of the Bankruptcy Code and was granted all the rights and powers set forth in the Liquidation Trust Agreement, including the right to prosecute, settle, or compromise the Debtors' causes of action.

## V.     FACTS

### A.     The Quorum Acquisition and MPT Secured Financing

25.     On September 30, 2019, Watsonville Holdings, an entity that the Halsen Executives formed and controlled, acquired all of the issued and outstanding shares in WHC and all of the outstanding membership interests in WHM from QHC California Holdings, LLC ("Quorum") pursuant to an equity purchase agreement (the "Equity Purchase Agreement") dated May 31, 2019 (such transaction, the "Quorum Acquisition").  WHC owned the Hospital, while WHM provided billing and other administrative services.

26.     The purchase price under the Equity Purchase Agreement (including closing costs of $2.3 million) was approximately $48.8 million (the "Purchase Price"), with $43.8 million due at closing, plus another $5 million payable to Quorum under a note (the "Quorum Note") from Watsonville Holdings, and guaranteed by Halsen Healthcare, with an annual interest rate of 9.25%.

27.     In order to fund the Purchase Price for the Quorum Acquisition, Watsonville Hospital Holding and Halsen Healthcare entered into financing transactions (collectively, the "MPT Secured Financing") with MPT of Watsonville Lender, LLC ("MPT Lender") and its affiliate MPT of Watsonville, LLC ("MPT Lessor" and, along with MPT Lender, "MPT") governed by a Master Agreement dated May 31, 2019 (the "Master Agreement").

28.     Pursuant to the Master Agreement and related agreements, MPT made a series of secured acquisition loans to Watsonville Holdings in the aggregate amount of $55,000,000.  Those secured acquisition loans were used by Watsonville Holdings to satisfy its obligations under the Equity Purchase Agreement.

29.     In addition, the Master Agreement required Watsonville Hospital to cause WHC to sell the real property (the "Real Property") owned by WHC (and on which the Hospital operated) to MPT Lessor for $40,000,000 immediately following the consummation of the Quorum Acquisition, and thereafter lease such Real Property back from MPT Lessor pursuant to a Lease Agreement dated September 30, 2019 (the "Lease Agreement").

30.     To secure its obligations under the Lease Agreement, WHC deposited a cash deposit of $2.6 million (the "Lease Deposit") with MPT Lessor at closing of the Quorum Acquisition.

31.     As part of the MPT Secured Financing, Watsonville Holdings executed a promissory note, dated as of September 30, 2019 (the "Initial MPT Note"), in favor of MPT Lender in the principal amount of $15 million.  The Initial MPT Note was assigned by Watsonville Holdings to, and assumed by, WHC, and MPT Lender and WHC entered into an Amended and Restated Promissory Note (the "MPT Note") evidencing such assumed $15 million secured loan.

32.     On information and belief, at closing of the Quorum Acquisition, $2 million of the funds (the "Halsen Management Distribution") provided by MPT Lender pursuant to the MPT Secured Financing were distributed to the Halsen Executives directly, or indirectly after passing through Halsen Holdings, Peninsula or South Texas, one of the Debtors, or another entity controlled by one or more of the Halsen Executives.

**B.     The Halsen Executives Appointed Themselves as the Sole Officers and Board Members of WHC and Failed to Implement Systems of Independent Oversight and Monitoring**

33.     During the entirety of their terms as WHC's officers, the Halsen Executives constituted the entirety of WHC's board of directors, officers, and senior leadership, while also being members of non-Debtor and co-defendant Halsen Holdings.  At all times relevant to this complaint, Halsen Holdings held, directly or indirectly, 100% of the equity interests of each of the Debtors.  An organizational chart showing the relationship of Halsen Holdings and its direct and indirect subsidiaries is attached as Exhibit F to this Complaint.

34.     Immediately upon the closing of the Quorum Acquisition, the Halsen Executives used their positions with Watsonville Holdings to appoint themselves as the sole members of

WHC's board of directors (the "Board") and the sole executive officers of WHC. They held the following positions from September 30, 2019 through January 22, 2021:

- Fowler, Chief Executive Officer ("CEO") and Board member
- King, Chief Financial Officer ("CFO") and Board member
- Brothman, Secretary and Chairman of Board

35. During that time, the Halsen Executives exercised complete and total control over the day-to-day operations and finances of WHC and the Hospital, with no independent oversight, until they were removed from their positions and replaced by new directors and officers at the direction of WHC's secured lender, MPT, on January 22, 2021. MPT caused such removal by exercising the proxy rights it obtained in connection with the MPT Secured Financing.

**C.      WHC Emerged From the Quorum Acquisition Insolvent and Immediately Descended into Deeper Insolvency Due to the Halsen Executives' Grossly Negligent Decision-making.**

36. WHC was insolvent upon the closing of the Quorum Acquisition due to the Halsen Executives' decision to finance the Quorum Acquisition with 100% debt and then use WHC's limited cash to immediately redeem notes issued by Halsen Healthcare, and pay unearned "consulting fees" to themselves, before obtaining a working capital line.

37. The Quorum Acquisition was 100% debt-financed by the MPT Secured Financing and the Quorum Note, without any other investment of capital, and without adequate working capital reserves.

38. Upon closing of the Quorum Acquisition, WHC's available working capital was woefully insufficient to meet its operational and debt service-related financial obligations. At closing, WHC was left with approximately $7.7 million of cash, $20 million of debt related to the Quorum Acquisition, and a $40 million lease obligation to MPT.

39. Over the three months immediately preceding the Quorum Acquisition, WHC's net EBITDA loss increased each month, for a total 3-month net EBITDA loss of approximately $7.4 million.

40.     In order to reverse, or at least lessen, that pattern of EBITDA losses, additional investment was required.  The Hospital had experienced years of neglect by its prior owner, and declining patient volumes due to poor facility management and insufficient corporate support.  The financial viability of the Hospital, and its ability to meet financial covenants under the MPT Secured Financing was dependent on post-closing investment in patient volume growth, streamlined efficiencies, and expansion of service lines.

41.     The Hospital also faced cash-flow challenges because it was overly reliant on Medicare and Medi-Cal payments and the California Quality Assurance Fee ("QAF") program which provides supplemental payments to California hospitals that serve Medi-Cal and uninsured patients.  Without the QAF payments, rendering medical services to Medi-Cal and uninsured patients would result in net losses to the Hospital.  Each of those sources of payment was also subject to regular delays and unpredictable timing.

42.     To compound the problem, under the MPT Secured Financing, WHC was required to apply the entirety of any QAF payments from and after January 1, 2020 to prepay down the MPT Note until it was paid in full.  This commitment of QAF proceeds that the Hospital needed for operating liquidity further compromised the Hospital's future sources of cash flow, and rendered it incapable of paying its debts as they came due.  In recognition of this foreseeable liquidity crisis, an additional source of working capital was essential.

43.     At the time the Master Agreement was executed to provide funding for the Quorum Acquisition, MPT, Watsonville Holdings and Halsen Healthcare anticipated that WHC would obtain approximately $10 million in financing from MidCap Financial post-closing to provide critical working capital.  Indeed, MPT and MidCap Financial had already negotiated the terms of an intercreditor agreement prior to the closing of the Quorum Acquisition.  But the anticipated working capital financing never materialized, causing WHC to face cash flow challenges and insolvency immediately after the Quorum Acquisition closed, which continued throughout the Halsen Executives' approximately 14-month tenure as the Hospital's management team, and

continued thereafter until WHC and its debtor affiliates commenced their Chapter 11 Cases on the Petition Date.

44.     Almost immediately after the Quorum Acquisition closed, and before obtaining a source of reliable working capital, the Halsen Executives began using WHC's limited cash to make payments to themselves, entities that they controlled, and their friends and family.  In just the first few days after the Quorum Acquisition closed, the Halsen Executives directed the following improper payments to be made:

(a)     <u>"Consulting Fees" Paid to Halsen Executives' Entities ($400,000)</u>.   On October 2, 2019 (just two days after the Quorum Acquisition closed), WHC paid (a) $200,000 to Peninsula Healthcare (an entity controlled by, and (on information and belief) the alter ego of, King) (the "<u>October 2, 2019 Peninsula Healthcare Transfer</u>") and (b) $200,000 to South Texas Associates (an entity controlled by, and (on information and belief) the alter ego of, Fowler) (the "<u>October 2, 2019 South Texas Associates Transfer</u>" and, along with the October 2, 2019 Peninsula Healthcare Transfer, the "<u>October 2, 2019 Entity Transfers</u>"), in each case for purported "Consulting Fees."  WHC's records do not evidence any agreement from WHC to pay such "Consulting Fees."  On information and belief, no services were provided to WHC in exchange for the October 2, 2019 Entity Transfers.  Moreover, even if Peninsula Healthcare and/ or South Texas Associates provided consulting services to WHC, such services would already have been owed by Fowler and King (who controlled those entities) as part of their duties as WHC's CEO and CFO, respectively, and by Halsen Healthcare, as the Hospital's manager under the Halsen MSA (as defined below).   The October 2, 2019 Entity Transfers constituted a breach of the Halsen Executives' fiduciary duties to WHC's stakeholders insofar as they determined to use WHC's limited cash, while WHC was insolvent, to pay their owned and controlled entities for services that were either never delivered, or already owed to WHC by Fowler, King, or Halsen Healthcare. [2]

(b)     <u>Investor Repayment ($260,000)</u>. On October 3, 2019, WHC wired $260,000

---

[2] As discussed further below, WHC was already obligated to handsomely compensate Fowler and King as WHC's CEO and CFO, and to further pay a monthly "Management Fee" of $100,000 to Halsen Healthcare (an entity that the Halsen Executives indirectly owned and controlled) to provide management services.

(the "October 3, 2019 Brothman Transfer") to Brothman.  The wire confirmation for the October 3, 2019 Brothman Transfer indicates that the purpose of this Transfer was "Investor Repayment." On information and belief, $60,000 of the October 3, 2019 Brothman Transfer was paid to redeem (at a 20% premium) a convertible note issued by Halsen Healthcare to Brothman's wife, Edith. WHC did not issue such convertible note and had no obligation to pay, or redeem, amounts owed to Edith thereunder.  WHC's books and records do not identify the basis for the other $200,000 of the October 3, 2019 Brothman Transfer.  On information and belief (given the matching amount, and closeness in time, to the October 2, 2019 Entity Transfers), the remaining $200,000 of the October 3, 2019 Brothman Transfer was paid to Brothman as "consulting fees" for services that were either never delivered, or were already owed to WHC by either (i) Brothman as part of his duties as Chairman of WHC's Board of Directors and an officer of WHC or (ii) Halsen Healthcare, as part of the management services it was obligated to provide to WHC pursuant to the Halsen MSA.  None of the October 3, 2019 Brothman Transfer paid any debt or other obligation of WHC, and WHC did not receive any value (let alone reasonably equivalent value) for making the October 3, 2019 Brothman Transfer.  The October 3, 2019 Brothman Transfer constituted a breach of the Halsen Executives' fiduciary duty to WHC's stakeholders insofar as the Halsen Executives determined to use WHC's limited cash, while WHC was insolvent, to pay Brothman and his wife Edith to redeem the note obligations of WHC's parent company – Halsen Holdings – despite no obligation to do so and to pay another $200,000 to Brothman for unidentified consideration that, on information and belief, was either never delivered, or was already owed to WHC by Brothman or Halsen Healthcare.

(c)     Improper Legal Fee Reimbursements (Total $54,436.52). On October 3, 2019, the Halsen Executives caused WHC to pay $54,436.52 (the "October 3, 2019 Hooper Lundy Transfer") to Hooper, Lundy & Bookman ("Hooper Lundy") for legal services rendered to Halsen Holdings in connection with the Quorum Acquisition.  The Hooper Lundy legal services provided no value (let alone reasonably equivalent value) to WHC, and WHC had no obligation to pay the fees billed to Halsen Holdings for such services.  The Halsen Executives' decision to direct that

WHC make the October 3, 2019 Hooper Lundy Transfer constituted a breach of their fiduciary duties to WHC's stakeholders insofar as the Halsen Executives determined to use WHC's limited cash, while WHC was insolvent, to pay the legal fees of Halsen Holdings, an entity that they controlled, despite WHC having no obligation to pay such fees.

(d)     WHC Redeems Notes Issued by Its Corporate Parent (Total $600,000). Between October 2, 2019 and January 15, 2020, the Halsen Executives caused WHC to redeem convertible notes issued by Halsen Healthcare at a 20% premium, in the total amount of $600,000. WHC did not issue the convertible notes and had no obligation to pay, or redeem, amounts owed thereunder.  These improper redemptions of Halsen Healthcare-issued notes included the following payments (collectively, the "Note Redemption Transfers"):

| Date | Noteholder | Amount |
|------|-----------|--------|
| 10/2/2019 | Eli Kammerman | $120,000 |
| 10/3/2019 | Edith Brothman | $60,000[3] |
| 12/19/2019 | Minh Bui | $240,000 |
| 1/7/2020 | Tan Le | $120,000 |
| 1/15/2020 | Andy Le | $60,000 |
| 1/15/2020 | Robert Hoo | $60,000 |
| **TOTAL** | | **$660,000** |

45.     The Note Redemption Transfers were made without independent oversight or approval, and during a time when WHC was cash-starved.  The first of the Note Redemption Transfers, made to Eli Kammerman in the amount of $120,000 (the "Eli Kammerman Note Redemption Transfer") on October 2, 2019, was made while WHC was insolvent or, alternatively, caused WHC to become insolvent.  The other $540,000 of the Note Redemption Transfers were made while WHC was insolvent.

---

[3] The Note Redemption Transfer to Edith was part of the $260,000 October 13, 2019 Brothman Transfer.

46. For purposes of this Complaint, the October 2, 2019 Entity Transfers, the October 3, 2019 Brothman Transfer, the October 2, 2019 Hooper Lundy Transfer, and the Eli Kammerman Note Redemption Transfer are referred to, collectively, as the "October 2019 Transfers."

47. Each of the October 2019 Transfers were made while WHC was insolvent or, alternatively, payment of the October 2019 Transfers caused WHC to become insolvent.

48. Even if WHC was not insolvent at closing, the making of the October 2019 Transfers just a few days after closing a 100% debt-funded transaction rendered WHC insolvent. Collectively, the October 2019 Transfers resulted in a total of $834,436.52 of WHC's limited cash becoming immediately unavailable to fund the Hospital's operations, and rendered it insolvent, inadequately capitalized, and unable to pay its debts as they came due.

49. WHC's Summary of Assets and Liabilities for Non-Individuals indicate that its liabilities exceeded its assets by over $33,000,000.00 on the Petition Date.

**D.    Defendants Owed Duties of Loyalty and Care to WHC's Stakeholders**

50. As a result of WHC's insolvency (which occurred by no later than October 2, 2019 and continued through the Petition Date), the Halsen Executives owed duties of loyalty and care to WHC's stakeholders, including its creditors.

51. As directors and officers of an insolvent Delaware corporation, the Halsen Executives owed fiduciary duties to WHC's creditors to consider creditors' interests in their decision-making.  In particular, Defendants owed fiduciary duties to WHC's creditors to avoid actions that would exacerbate WHC's insolvency, inadequate capitalization and inability to pay its debts as they came due.

52. Defendants' decision to use WHC's limited cash to make the October 2019 Transfers, with no benefit to WHC or its creditors, at a time when WHC was insolvent, inadequately capitalized, starved for cash, and unable to pay its debts as they came due, was grossly negligent and was a breach of their fiduciary duties to WHC's creditors.

53. The multiple hats that the Halsen Executives wore as directors, officers, indirect equity owners, and indirect controlling members of Halsen Healthcare, the management services

provider to the Hospital,[4] created a conflict of interest that implicated the Halsen Executives' fiduciary duties owed to WHC and its creditors.

54.     In the face of that conflict of interest, the Halsen Executives neglected to put in place any procedural or supervisory mechanisms that could have prevented WHC from engaging in the grossly unreasonable transactions that severely harmed the Hospital during their tenure, and led to WHC's financially distressed spiral towards bankruptcy.

**E.     Entry into Compensation Arrangements Without Independent Oversight and Notwithstanding WHC's Cash Flow Challenges**

55.     Despite the Hospital's insolvency, the Halsen Executives obligated WHC to double-pay themselves by causing WHC, effective October 1, 2019, to enter into both (a) employment agreements to pay themselves above-market annual salaries and PTO benefits[5] plus "unlimited travel and living expenses" (collectively, the "Halsen Employment Agreements") and (b) a Management Services Agreement (the "Halsen MSA") with Halsen Healthcare which obligated WHC to pay Halsen Healthcare (an entity they controlled) another $100,000 per month as a "Management Fee."[6]   The Management Fee inured to each of the Halsen Executives' individual benefit insofar as they controlled and had indirect ownership interests in Halsen Healthcare.

56.     At the time the Halsen Employment Agreements and Halsen MSA were executed, the Halsen Executives controlled both WHC and Halsen Healthcare, and constituted WHC's entire board and senior leadership.  They used that control to implement the terms they chose in their unfettered discretion.  Indeed, the Halsen MSA was signed by Fowler on behalf of WHC and by Brothman on behalf of Halsen Healthcare.

57.     Despite the conflict of interest inherent to controlling both sides of the "negotiations" when the terms personally benefitted themselves, the Halsen Executives' decision

---

[4] Halsen Healthcare was controlled by Halsen Holdings, which in turn was controlled by the Halsen Executives in their capacities as its majority members.

[5] The Employment Agreements obligated WHC to pay salaries to the Halsen Executives as Chairman of the Board (Brothman), CEO (Fowler), and CFO (King) of $340,000, $330,000, and $330,000, respectively.  Upon termination after a 16 month role at the Hospital, the Halsen Executives were paid a combined $195,678 in unused PTO, split evenly among them ($65,226 each) for 16 months of service in their officer roles.

[6] The Halsen MSA provided for the Management Fee to be $20,000 for the first six months and then rise to $100,000 per month thereafter.

to cause WHC to enter into those agreements was made with no independent oversight, at a time when they knew the anticipated working capital financing had not been obtained, and that cash was limited.

58.     The Halsen Executives' decision to obligate WHC to pay the Management Fee was a breach of their fiduciary duty to creditors because the management services to be provided by Halsen Healthcare under the Halsen MSA should have fallen largely, if not entirely, within the scope of the Halsen Executives' duties as WHC's Chairman of the Board, CEO, and CFO, for which they had already obligated WHC to pay themselves lucrative salaries, PTO benefits, and "unlimited travel and living expenses."

59.     These arrangements were not arms' length, and were not fair.  Aside from the double-pay obligation described above, the Halsen Executives caused WHC to unreasonably reimburse themselves for over $365,559 in living expenses (the "Living Expense Transfers"), including car allowance, auto insurance, housing, groceries, dry cleaners, dining out, and more—again all without any reasonable independent oversight or justifiable business purpose.

60.     As of the filing of the Complaint, Plaintiff has not found a record that the Management Fee was paid, and therefore has not included the recovery of any such Management Fees in its alleged damages.  However, Plaintiff reserves the right to seek recovery of any amounts paid pursuant to the Halsen MSA that are identified in the course of discovery.

**F.      The Halsen Executives' Management of the Hospital was Grossly Negligent**

61.     The Halsen Executives' failure to implement basic elements of control and oversight at the Hospital led to numerous inexcusable errors.  As a result, their tenure was marked by material and persistent defaults under the MPT Note, and grossly negligent financial mismanagement that materially exacerbated the Hospital's financial struggles, deepened its insolvency, and threatened ongoing patient care.

62.     On April 13, 2020 (less than 7 months after the Quorum Acquisition closed), MPT issued its first of several notices of default to the Debtors.

63.     Between January 18, 2021 and the Petition Date, the Debtors entered into a series of forbearance agreements with MPT wherein MPT agreed to forbear from exercising various of its remedies under its loan documents.

64.     The defaults under the MPT Note were never cured.

65.     A few non-exhaustive examples set forth below show the grossly negligent nature of the Halsen Executives' operational and financial mismanagement of the Hospital:

(a)     The Halsen Executives caused WHC to hire Heroic Security ("Heroic"), a cybersecurity company with no previous experience providing full-service IT management services (much less doing so for a hospital) to install, maintain and service all of the Hospital's network, internet and computer infrastructure.  On information and belief, Heroic's owner was a friend of King, and such relationship clouded the decision to put the Hospital's critical network infrastructure at risk in order to give King's friend the chance to prove Heroic's ability to transition from a cybersecurity company to a full-service IT management services provider, with the Hospital as the guinea pig for the experiment.  As a result of this grossly negligent adventure, the Hospital's network was consistently unreliable and was never good enough to provide a minimally acceptable level of performance.  Severe internet and network connection issues were commonplace, and system latencies and bandwidth deficiencies contributed to the poor performance of the Hospital's electronic medical records system, resulting in billing and other errors further imperiling the Hospital.

(b)     Their decision to hire King's friend to provide IT management services was not the only incident of the Halsen Executives allowing the Hospital to become a guinea pig for a vendor attempting to establish their ability to serve hospitals like Watsonville.   As another example, the Halsen Executives agreed to implement an untested and essentially beta version of a cloud-based electronic medical record system. Disruptions, operational glitches and failures of that medical records system resulted in further errors imperiling the Hospital.

(c)     The Halsen Executives grossly mismanaged the Hospital's conversion from the Community Health Systems (CHS) version of the Hospital's medical records hosting system

that was in place upon closing of the Quorum Acquisition to the Hospital's own version of the medical records hosting system.  They hired and relied on an independent contractor that was frequently off-site to oversee the conversion with no backup or contingency plan to address disruptions.  They also failed to identify and implement service line and analytic reporting forms to replace the CHS reporting forms that were no longer accessible when the CHS transition services agreement expired.  In mid-2020, that poor planning led to a period of approximately 30 days when system disruptions prevented the Hospital from billing for any of its services, leading to enormous collection problems, resulting in millions of dollars of revenue being lost.

(d)      Settlement Payment to Chris Wheeler (Total $282,763.90).    Between September 10, 2020 and December 24, 2020, the Halsen Executives caused WHC to make payments totaling $240,000 (the "Wheeler Settlement Transfers") to Chris Wheeler ("Wheeler") (a former equity holder at Halsen Holdings) pursuant to a settlement (the "Wheeler Settlement") between Halsen Holdings, Brothman, Fowler, King, and Wheeler.  The Wheeler Settlement settled all of Wheeler's claims against Halsen Holdings and the Halsen Executives, and resulted in Halsen Holdings acquiring from Wheeler his membership interests in Halsen Holdings. But WHC was not a party to the Wheeler Settlement, received no consideration therefrom, and had no obligation to make any payment thereunder.  On information and belief, the Halsen Executives also caused WHC to pay a total of no less than $45,563.90 (the "McDermott Fee Transfer") to McDermott Will & Emery for services rendered to Halsen Holdings and the Halsen Executives in connection with the Wheeler Settlement, and for which WHC had no obligation to pay.

(e)      The Halsen Executives slowed or ceased payments to vendors, suppliers, and employees, and to fund employee pharmacy and medical benefit claims, and the employee pension plan at a time when they were prioritizing paying themselves above-market salaries, reimbursing themselves for exorbitant living expenses, and redeeming stock held by friends and family.  These incidents of preferring paying themselves over third party creditors included (among other things):

(i)      The Halsen Executives caused the Hospital to slow payments to vendors, resulting in an increase in accounts payable from $8,000,000 on December 31, 2019 to

$26,200,000 on December 31, 2020. This accumulation of payables resulted in vendors levying interest and late fees, delays in securing critical patient supplies, and lost goodwill from employees, physicians, vendors, and community stakeholders.

(ii)     The Halsen Executives caused the Hospital to cease paying employee pharmacy and medical benefit claims on its self-funded plan, resulting in more than $1,800,000 in unpaid claims, and employees and their family members being taken to collections for medical services they expected would be covered as part of their employer-provided health insurance.

(iii)     The Halsen Executives caused the Hospital to improperly hold on to $232,000 in employee payroll withholdings for union dues, life insurance, 401(k), and vision and dental insurance.

(iv)     The Halsen Executives caused the Hospital to fail to fund the employee pension plan by December 31, 2020, and failed to communicate with Principal – the plan's actuary – of any intent to pay it before the PBGC deadline of January 31, 2021.

(f)     The Halsen Executives caused WHC to cash an IRS refund check in the amount of $741,053.50 that they knew at the time had been improperly issued, exposing WHC to IRS claims for reimbursement, interest and penalties.

66.     On information and belief, as defaults mounted under the MPT Secured Financing, the Halsen Executives provided financial reporting to MPT that understated just how dire the Hospital's circumstances were, including a growing backlog of accounts payable for staff obligations and trade debt.

67.     Clear and accurate reporting would have allowed MPT to identify mounting financial distress, and address these problems through the earlier exercise of remedies.  Instead, WHC continued to operate at increasingly negative cash flow while incurring additional secured and unsecured debt, thereby exacerbating the unsecured exposure of WHC's trade and other creditors.

68.     These examples reflect an unprepared and overwhelmed management team, unreasonably operating without independent oversight that did not, or could not, exercise the care and diligence required for running a complex operation such as the Hospital.

69.     And as the Hospital floundered, the Halsen Executives continued to pay themselves exorbitant salaries, living expenses, and other benefits. All of the above is evidence of grossly negligent behavior.

### G.     Entry into Lucrative Severance Agreements While WHC Was Insolvent and in Anticipation of Removal by WHC's Secured Lender

70.     In August 2020, the Halsen Executives violated their fiduciary duties to WHC's stakeholders by causing WHC to enter into addendums to their employment agreements obligating WHC to pay each of them three years of compensation if their services were terminated following a change of control, and they were not offered the same position, salary or benefits at the Hospital.

71.     On January 28, 2022, Fowler filed a proof of claim, No. 84, in the Chapter 11 Case of WHC asserting a general unsecured claim for $990,000 (the "Fowler Claim") for amounts allegedly due for severance under the addendum to his employment agreement (the "Fowler Severance Agreement").

72.     On February 6, 2022, Brothman filed a proof of claim, No. 132, in the Chapter 11 Case of WHC asserting a general unsecured claim for $990,000 (the "Brothman Claim") for amounts allegedly due for severance under an addendum to his employment agreement (the "Brothman Severance Agreement").

73.     On March 4, 2022, King filed a proof of claim, No. 179, in the Chapter 11 Case of WHC asserting a general unsecured claim for $990,000 (the "King Claim") for amounts allegedly due for severance under an addendum to his employment agreement (the "King Severance Agreement").

74.     The Brothman Severance Agreement, Fowler Severance Agreement, and King Severance Agreement are, collectively, referred to in this Complaint as the "Severance Agreements." The Brothman Claim, Fowler Claim, and King Claim are, collectively, referred to

in this Complaint as the "<u>Halsen Executive Claims.</u>"

75.    The Severance Agreements were insider transactions, without independent oversight, that were anything but fair and arms' length.

76.    Execution of the Severance Agreements also violated Sections 5 and 10 of the Subordination Agreement executed in connection with the MPT Secured Financing by increasing the compensation payable to the Halsen Executives during pendency of an event of default under the MPT Secured Financing.

77.    The staggering amount of the Severance Agreement obligations is well above market, and patently unreasonable in light of WHC's distressed financial situation from the time the Quorum Acquisition closed until the Petition Date.

78.    The Severance Agreements are also highly irregular on their face insofar as they purport to award a near absolute right to severance without customary carveouts for termination for cause or failure to cooperate in the performance of their duties. Other terms and conditions customarily found in agreements of this type that would protect the interests of the corporation are also notably absent.

79.    The timing of the Halsen Executives' entry into the Severance Agreements was equally unreasonable.  They were entered into at a time when, under the Halsen Executives' stewardship, WHC was balance sheet insolvent, failing to pay its other debts as they came due, and in default under the MPT Secured Financing agreements and the Lease Agreement.

80.    On information and belief, the Halsen Executives failed to disclose to MPT, or to seek consent from MPT concerning, their entry into the Severance Agreements.

81.    The Severance Agreement imposed $3 million of new obligations on WHC without consideration (and certainly not in exchange for reasonably equivalent value).  In fact, on information and belief, the Halsen Executives recognized that, because WHC was in default under the MPT Loan, there was a significant likelihood that MPT would exercise its proxy rights to remove them from their positions as officers and members of WHC's board, and therefor executed

the Severance Agreements in an effort to both (a) deter their removal and (b) line their own pockets on the way out.

82.    In sum, the Halsen Executives' decision to execute the Severance Agreements was a breach of their fiduciary duties to WHC's stakeholders.  WHC's obligations under the Severance Agreements are also avoidable as fraudulent transfers insofar as the execution of the Severance Agreements constituted fraudulent transfers made with fraudulent intent, and were imposed without receiving reasonably equivalent value in exchange.  Because each of the Halsen Executive Claims is based on obligations imposed by the Severance Agreement, each of the Halsen Executive Claims should therefore be disallowed in its entirety.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**(Against Defendants Brothman, King, and Fowler)**

83.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

84.    As set forth in detail in this Complaint, each of Brothman, King, and Fowler was a member of WHC's board of directors, and a fiduciary of WHC, and its creditors, at all times relevant to this Complaint.

85.    As set forth in detail in this Complaint, each of Brothman, King and Fowler was an officer of WHC at all times relevant to this Complaint.  The Halsen Executives also constituted the entirety of WHC's board of directors at all times relevant to this Complaint.

86.    Each of Brothman, King, and Fowler owed WHC fiduciary duties of care, loyalty, and good faith.

87.    As a result of WHC's insolvency (which occurred by no later than October 2, 2019 and continued through the Petition Date), each of Brothman, King, and Fowler also owed fiduciary duties of care, loyalty, and good faith to WHC's creditors.

88.    The duty of loyalty obligated Brothman, King, and Fowler each to commit themselves to the business of WHC with the attitude of promoting the interests of WHC and WHC's

creditors, and not themselves.

89.     The duty of loyalty is breached, *inter alia*: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when a fiduciary "abdicates" their fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

90.     The duty of care is breached, *inter alia*: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of "gross negligence."

91.     Without limiting the foregoing, each of Brothman, Fowler, and King breached his fiduciary duties to WHC and its creditors by, among other things:

        a.      Using $2 million of the proceeds of the MPT Secured Financing to enrich themselves and/or entities that they directly or indirectly owned or controlled via the Halsen Management Distribution without having secured a reliable source of working capital, and with a foreseeable liquidity crisis looming;

        b.      making, or allowing to be made, improper fraudulent transfers by WHC that totaled at least $1,962,687.83 (in addition to the Halsen Management Distribution);

        c.      engaging in numerous acts of self-dealing, including, but not limited to: (i) causing WHC to pay each of Peninsula Healthcare (an entity controlled by King), South Texas Associates (an entity controlled by Fowler), and Brothman $200,000 shortly after the closing of the Quorum without consideration (and certainly not for reasonably equivalent value); (ii) causing WHC to pay at least $100,000 of legal fees for services rendered to Halsen Holdings and Halsen Healthcare (entities in which they had a direct or indirect ownership interest, and each of which they controlled); (iii) causing WHC to pay $240,000 to Chris Wheeler pursuant to a settlement that released claims asserted against themselves and Halsen Holdings (despite the fact that WHC was not a party to that settlement); (iv) causing WHC to redeem, at a 20% premium, convertible notes issued by Halsen Healthcare (an entity in which they had an indirect controlling ownership interest) in the total amount of $660,000, including a note issued to Brothman's wife Edith and friends of

the Halsen Executives, notwithstanding that WHC had no obligation to redeem such notes; (v) causing WHC to consider personal relationships and friendships in making operational decisions, such as, for example, hiring an unproven IT management services provider to maintain the Hospital's critical  network, internet and computer infrastructure because of the provider's owner's friendship with King; (vi) causing WHC to (a) enter into the Halsen Employment Agreements to pay themselves above-market annual salaries plus "unlimited travel and living expenses" and the Halsen MSA which obligated WHC to pay Halsen Healthcare (an entity they controlled) another $100,000 per month as a "Management Fee" and (b) award to themselves lucrative severance agreements in an effort to circumvent provisions in the Subordination Agreement prohibiting increasing their compensation during an event of default under the MPT Secured Financing; and (vii) using or allowing to be used WHC's funds to pay for over $365,559 of their living expenses (including car allowance, auto insurance, housing, groceries, dry cleaners, dining out, and more) without any reasonable independent oversight or justifiable business purpose.

        d.      being grossly negligent in managing the Hospital's operations, including, for example, their gross negligence in managing the Hospital's conversion from the Community Health Systems (CHS) version of the Hospital's medical records hosting system that was in place upon closing of the Quorum Acquisition to the Hospital's own version of the medical records hosting system, leading to a period of approximately 30 days when system disruptions prevented WHC from billing for any of its services, leading to enormous collection problems, resulting in millions of dollars of revenue being lost.

        e.      concealing from WHC's lender, MPT: (i) the severity of WHC's financial distress, (ii) their direction of, or consent to, WHC making the Transfers which constitute fraudulent transfers, and (iii) their execution of the Severance Agreements;

        f.      failing to maintain and preserve WHC's assets and records;

        g.      failing to hold board meetings and/or failing to maintain minutes of any such meetings;

h.      failing to keep, or cause to be kept, accurate, complete and proper books; and

i.      engaging in other acts of fraud, gross negligence, or other material breaches of their fiduciary duties.

92.     The conduct of the Halsen Executives, as alleged in this Complaint, was intentional, reckless, and/or grossly negligent.

93.     At all times relevant hereto, Brothman, Fowler, and King each engaged in self-dealing, prioritizing their own interests and the interests of their affiliates over the interests of WHC and its creditors.

94.     Accordingly, the business judgment rule does not apply and Brothman, Fowler and King are subject to the entire fairness standard.

95.     As a result of the many breaches of fiduciary duties by Brothman, Fowler and King, as set forth herein, WHC, and its creditors, suffered damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

96.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

97.     As set forth in detail in this Complaint, at all times relevant hereto, Brothman, King and Fowler each was an officer and member of the board of directors of WHC and owed WHC and its creditors fiduciary duties of care, loyalty and good faith.

98.     As also set forth in detail in this Complaint, Brothman, King and Fowler each repeatedly breached his or her fiduciary duties of care, loyalty and good faith owed to WHC and its creditors.

99.     Each of the Defendants aided and abetted these breaches of fiduciary duty.

100.    On information and belief, each of the Defendants had knowledge that Brothman's, King's and Fowler's conduct was a breach of his or her fiduciary duties owed to WHC and its creditors.

101.    Each of the Defendants substantially assisted and/or encouraged Brothman, King and Fowler to breach their fiduciary duties owed to the Debtor.

102.    Each Defendant's conduct was a substantial factor in causing the harm to Plaintiff alleged in the previous paragraphs of this Complaint.

103.    Each of Brothman, King and Fowler could have examined WHC's books and records and taken steps in response to the other Halsen Executives' gross mismanagement, blatant self-dealing, and other breaches of their fiduciary duties. Instead, each of them did nothing to prevent the other's continuing harm to WHC and its creditors, and accepted their share of the fruits of the others' breaches of fiduciary duty.

104.    Defendant Halsen Holdings is a limited liability entity that is, on information and belief, owned and controlled by Brothman, Fowler and King. Halsen Holdings aided and abetted the Halsen Executives' breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme including, but not limited to, WHC's improper payment of Halsen Holdings' obligations under the settlement agreement with Christopher Wheeler; (ii) accepting the benefit of WHC paying legal fees owed by Halsen Holdings to McDermott Will & Emery and  Hooper Lundy; (iii) being used as an instrumentality of that fraudulent scheme; (iv) using its indirect control of WHC to support and facilitate the Halsen Executives' breaches of fiduciary duty; and (v) other acts and omissions as alleged in this Complaint.

105.    Defendant Peninsula Healthcare is, on information and belief, a limited liability company owned and controlled by King.  Peninsula Healthcare aided and abetted the Halsen Executives' breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme including, but not limited to, WHC's improper payment of $200,000 to Peninsula Healthcare just days after closing of the Quorum Acquisition; (ii) being used as an instrumentality of that fraudulent scheme; and (iii) other acts and omissions as alleged in this Complaint.

106.    Defendant South Texas Associates is, on information and belief, a corporation controlled by Fowler.  South Texas Associates aided and abetted the Halsen Exeutive's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme including, but not limited to, WHC's improper payment of $200,000 to South Texas Associates just days after closing of the Quorum Acquisition; (ii) being used as an instrumentality of that fraudulent scheme; and (iii) other acts and omissions as alleged in this Complaint.

107.    Edith is Brothman's wife and aided and abetted the Halsen Executives' breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme including, but not limited to, WHC's improper redemption of the convertible note issued to her by Halsen Healthcare just days after closing of the Quorum Acquisition; (ii) being used as an instrumentality of that fraudulent scheme; and (iii) other acts and omissions as alleged in this Complaint.

108.    As a result of each Defendant's aiding and abetting of the breaches of fiduciary duty by the Halsen Executives as set forth herein, WHC and its creditors suffered damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Avoidance of Constructively Fraudulent Transfers Under**
**11 U.S.C. § 548 (a)(1)(B)(i) and (ii)( (I), (II), and/or (III)**
**(Against all Defendants)**

109.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

110.    Each of the Transfers listed in Exhibit C hereto (the "Two Year Transfers") was made by one of the Debtors and constitutes a transfer of a debtor's interest in property to one or more of the Defendants within two (2) years of the Petition Date.  Exhibit C identifies the date, amount, and recipient of each of the Two Year Transfers.

111.    WHC did not receive reasonably equivalent value in exchange for any of the Two Year Transfers.

112.    At the time it made each of the Two Year Transfers, WHC (a) was insolvent or became insolvent as the result of the transfer, (b) was engaged in a business or a transaction, or about to engage in business or transaction, for which any property remaining with WHC was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.  Each of the Two Year Transfers is avoidable under 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I), (II), and/or (III).

113.    Under 11 U.S.C. § 550, the Trustee may recover each of the Two Year Transfers or their value from the transferee or a subsequent transferee, and may avoid the obligations incurred pursuant to the severance agreements.

114.    Accordingly, Plaintiff is entitled to a judgment against Defendants and any subsequent transferees for the Transfers in an amount not less than $630,941.

## FOURTH CAUSE OF ACTION
**Avoidance of Employment Transfers Under 11 U.S.C. § 548 (a)(1)(B)(i) and (ii)(IV)
(Against Defendants Brothman, King, and Fowler)**

115.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

116.    Each of the Transfers listed in Exhibit D hereto (the "Employment Contract Transfers") was made by one of the Debtors and constitutes a transfer of a debtor's interest in property to one or more of the Defendants within two (2) years of the Petition Date.  Exhibit D identifies the date, amount, and recipient of each of the Employment Contract Transfers.

117.    The Employment Contract Transfers to Defendants (which include reimbursement of the Halsen Executives for personal expenses unrelated to the operation of the Hospital) constitute transfers made and/or obligations incurred for the benefit of an insider under an employment contract and not in the ordinary course of business.

118.    WHC's entry into the Severance Agreements with the Halsen Executives occurred within two (2) years of the Petition Date and resulted in the incurrence of an obligation, to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

119.     WHC did not receive reasonably equivalent value in exchange for the Employment Contract Transfers, for its entry into the Severance Agreements, and for its reimbursement of the Halsen Executives for personal expenses unrelated to the operation of the Hospital.

120.     Each of the Employment Contract Transfers and WHC's entry into the Severance Agreements are avoidable under 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(IV).

121.     Under 11 U.S.C. § 550, the Trustee may recover the Employment Contract Transfers or their value from the transferee or a subsequent transferee, and may avoid the obligations imposed on WHC by the Severance Agreements.

122.     Accordingly, Plaintiff is entitled to a judgment against Defendants and any subsequent transferees for the Transfers in an amount not less than $345,376.85 and voiding WHC's obligations under the Severance Agreements.

### FIFTH CAUSE OF ACTION
**Avoidance of Fraudulent Transfers Made with Actual Fraudulent Intent**
**Pursuant to 11 U.S.C. § 548(a)(1)(A)**
**Against All Defendants**

123.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

124.     A trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two (2) years before the petition date with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted on or after the date such transfer was made or such obligation was incurred.

125.     As set forth in detail in this Complaint, the Trustee seeks to avoid the Two Year Transfers and to recover the value thereof from Defendants.

126.     Each of the Two Year Transfers was a "transfer" within the meaning of 11 U.S.C. § 101(54).

127.     Each of the Two Year Transfers was a transfer of property, or of an interest in property, of one of the Debtors to and/or for the benefit the above-named Defendants.

128.     Each of the Two Year Transfers was made with actual intent to hinder, delay, or

defraud the Debtor's Estate and its creditors. Among other things, the Halsen Executives personally benefitted from WHC satisfying the obligations of Halsen Holdings and Halsen Healthcare, entities controlled by the Halsen Executives (who held equity interests in each either directly, or indirectly) thereby increasing the value of Halsen Holdings and Halsen Healthcare to the detriment of WHC and its creditors. The Halsen Executives also personally benefitted from the Transfers made to Edith (Brothman's wife), Peninsula Healthcare (owned and controlled by King), South Texas Associates (owned and controlled by Fowler), and the Note Redemption Transfers that redeemed notes issued to the Halsen Executives' friends and family.

129. None of the above-named Defendants took any of the Transfers in good faith.

130. WHC did not receive value (and certainly not reasonably equivalent value) for any of the Transfers.

131. Therefore, the Two Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

132. Under 11 U.S.C. § 550, the Trustee may recover each of the Two Year Transfers or their value from the transferee or a subsequent transferee, and may avoid the obligations incurred pursuant to the severance agreements.

133. Accordingly, Plaintiff is entitled to a judgment against Defendants and any subsequent transferees for the Transfers in an amount not less than $630,941.

**SIXTH CAUSE OF ACTION**
**Recovery of Fraudulent Transfers Made with Fraudulent Intent**
**Pursuant to 11 U.S.C. § 544; and Applicable State Law, Including**
**6 Del. Code § 1304 and California Civil Code § 3439.04**
**(Against All Defendants)**

134. The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

135. Each of the Transfers listed in Exhibit B hereto (the "Four Year Transfers") was made by one of the Debtors and constitutes a transfer of a debtor's interest in property to one or

more of the Defendants within four (4) years of the Petition Date.  Exhibit B identifies the date, amount, and recipient of each of the Four Year Transfers.

136.    Each of the Four Year Transfers is avoidable as a "transfer" within the meaning of Cal. Civ. Code § 3439.01(m), 6 Del. Code § 1301(12), and 11 U.S.C. § 101(54).

137.    Each of the Four Year Transfers was a transfer of property, or of an interest in property, of one of the Debtors to and/or for the benefit the above-named Defendants.

138.    The Four Year Transfers each occurred within four years before the Petition Date.

139.    Each of the Four Year Transfers was made with actual intent to hinder, delay or defraud creditors of WHC.  Among other things, the Halsen Executives personally benefitted from WHC satisfying the obligations of Halsen Holdings and Halsen Healthcare, entities controlled by the Halsen Executives (who held equity interests in each either directly, or indirectly) thereby increasing the value of Halsen Holdings and Halsen Healthcare to the detriment of WHC and its creditors.  The Halsen Executives also personally benefitted from the Transfers made to Edith (Brothman's wife) and Peninsula Healthcare (owned and controlled by King) and South Texas Associates (owned and controlled by Fowler), and the Note Redemption Transfers that redeemed notes issued to the Halsen Executives' friends and family.

140.    The Four Year Transfers were each made without receiving reasonably equivalent value in exchange for the Transfer.

141.    At the time of each of the Four Year Transfers, WHC (a) was insolvent or became insolvent as a result of the Transfer; (b) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

142.    At all times relevant hereto, the Debtor had at least one general unsecured creditor (the "Predicate Creditor") holding an allowable claim who, but for the Debtor's bankruptcy filing, would have standing to bring claims to avoid and recover the Four Year Transfers. The Predicate

Creditors include, without limitation, the Internal Revenue Service and MPT (which was under-secured due to its collateral being worth less than the amount it loaned to WHC).

143.    Therefore, the Four Year Transfers are avoidable pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation 6 Del. Code § 1304 and California Civil Code § 3439.04.

144.    Under 11 U.S.C. § 550, the Trustee may recover each of the Four Year Transfers or their value from the transferee or a subsequent transferee, and may avoid the obligations incurred pursuant to the severance agreements.

145.    Accordingly, Plaintiff is entitled to a judgment against Defendants and any subsequent transferees for the Four Year Transfers in an amount not less than $3,365,560.

**SEVENTH CAUSE OF ACTION**
**Recovery of Constructively Fraudulent Transfers**
**Pursuant to 11 U.S.C. § 544; and Applicable State Law, Including**
**6 Del. Code § 1304 and 1305 and California Civil Code §§ 3439.04 and 3439.05**
**(Against All Defendants)**

146.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

147.    Each of the Four Year Transfers is avoidable as a "transfer" within the meaning of Cal. Civ. Code § 3439.01(m), 6 Del. Code § 1301(12), and 11 U.S.C. § 101(54).

148.    Each of the Four Year Transfers was a transfer of property, or of an interest in property, of one of the Debtors to and/or for the benefit the above-named Defendants.

149.    The Four Year Transfers each occurred within four years before the Petition Date.

150.    The Four Year Transfers were each made without receiving reasonably equivalent value in exchange for the Transfer.

151.    At the time of each of the Four Year Transfers, WHC (a) was insolvent or became insolvent as a result of the Transfer; (b) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

152.    At all times relevant hereto, the Debtor had at least one general unsecured creditor holding an allowable claim who, but for the Debtor's bankruptcy filing, would have standing to bring claims to avoid and recover the Four Year Transfers. The Predicate Creditors include, without limitation, the Internal Revenue Service and MPT (which was under-secured due to its collateral being worth less than the amount it loaned to WHC).

153.    Therefore, the Four Year Transfers are avoidable pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation 6 Del. Code §§ 1304 and 1305 and California Civil Code §§ 3439.04 and 3439.05.

154.    Plaintiff is entitled to a judgment against Defendants and any subsequent transferees for the Four Year Transfers in an amount not less than $3,365,560.

### EIGHTH CAUSE OF ACTION
**Recovery of Avoidable Preferential Transfers Pursuant to 11 U.S.C. § 547**
**(Against Halsen Executives)**

155.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

156.    Each of the Transfers listed in Exhibit E hereto (the "Preferential Transfers") was made by one of the Debtors and constitutes a transfer of a debtor's interest in property to one or more of the Defendants.  Exhibit E identifies the date, amount, and recipient of each of the Preferential Transfers.

157.    Each of the Preferential Transfers was made to or for the benefit of a creditor within one (1) year prior to the Petition Date and, at the time each of the Preferential Transfers was made, the recipient was an insider.

158.    Each of the Preferential Transfers was made on account of antecedent debt owed by one of the Debtors to one or more of the Halsen Executives before such Preferential Transfer was made.

159.    At the time of each of the Preferential Transfers, WHC (a) was insolvent or became insolvent as a result of the Transfer; (b) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or

1   transaction; and/or (c) intended to incur, or believed or reasonably should have believed that it

2   would incur, debts beyond its ability to pay as they came due.

3       160.    The chapter 7 liquidation analysis contained in Exhibit C of the *Disclosure*

4   *Statement for First Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and*

5   *Official Committee of Unsecured Creditors* [Docket No. 544] shows that general unsecured

6   creditors of the Debtors would receive no distribution in a hypothetical liquidation. Accordingly,

7   the Transfers enabled the Halsen Executives to receive more than they would have received if

8   (i) WHC's bankruptcy case was a case under Chapter 7 of the Bankruptcy Code, (ii) the Preferential

9   Transfers had not been made, and (iii) the Halsen Executives received payment of the debt to the

10  extent allowed by the Bankruptcy Code.

11      161.    Based upon the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §

12  547(b).

13      162.    Plaintiff is entitled to a judgment against Defendants and any subsequent transferees

14  for the Transfers in an amount not less than $77,037.35.

15  **NINTH CAUSE OF ACTION**
**Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550**
16  **(Against All Defendants)**

17      163.    The allegations set forth in the previous paragraphs are incorporated herein by

18  reference as if set forth at length.

19      164.    Plaintiff is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 544, 547 and 548

20  and 6 Del. Code §§ 1304 and 1305 and California Civil Code §§ 3439.04 and 3439.05.

21      165.    The Defendants are the initial transferees, or the immediate, mediate, or subsequent

22  transferee, of one or more of the Transfers.

23      166.    The Trustee may recover, and intends to recover, the Transfers and benefits

24  therefrom from any and all mediate, intermediate, or subsequent transferees.

25      167.    Accordingly, the Trustee is entitled to avoid and recover the Transfers from the

26  Defendants pursuant to pursuant to 11 U.S.C. § 550 and applicable law, including without limitation

27  6 Del. Code § 1307 and California Civil Code § 3439.07.

28

168.    Accordingly, Plaintiff is entitled to a judgment against Defendants and any subsequent transferees for the Transfers in an amount not less than $3,365,560.

### TENTH CAUSE OF ACTION
**Disallowance of all Claims**
**Under 11 U.S.C. § 502(d)**
**(Against all Defendants)**

169.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

170.    Defendants are transferees of transfers avoidable under Section 544, 547 and/or 548 of the Bankruptcy Code, which property is recoverable under Section 550 of the Bankruptcy Code.

171.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Defendants and/or their assignees against Plaintiff or the Debtors' estates must be disallowed until such time as the Halsen Executives pay Plaintiff an amount equal to the Transfers, plus interest thereon and costs.

172.    Defendants have not satisfied their liability for the Transfers or turned over such property for which Defendant is liable under section 550 of the Bankruptcy Code.

173.    Accordingly, each of Defendants' claims in the Chapter 11 Cases, including, but not limited to, the Brothman Claim, the Fowler Claim, and the King Claim, must be disallowed until such time as the Defendants holding such claims pay to Plaintiff the amount equal to the Transfers, plus interest thereon and costs.

### ELEVENTH CAUSE OF ACTION
**Disallowance of all Claims of Halsen Executives**
**Pursuant to 11 U.S.C. § 502(b)**
**(Against Halsen Executives)**

174.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

175.    Pursuant to Section 502(b) of the Bankruptcy Code, if an objection is made to a claim asserted in a proof of claim filed in a bankruptcy case, the Court shall disallow such claim to the extent that (1) such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law for a reason other than because such claim is contingent or unmatured; (2) such claim is for services of an insider of the debtor to the extent such claim exceeds the reasonable value of such services, or (3) such claim is the claim of an employee for damages resulting from the termination of an employment contract, and such claim exceeds the compensation provided by such contract, without acceleration, for one year following the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract.

176.    Each of the Brothman Claim, Fowler Claim and King Claim assert proofs of claims against WHC that arise solely out of the Severance Agreements, which were addendums to their pre-existing employment agreements.

177.    For the reasons described in the previous paragraphs, WHC's entry into the Severance Agreements, and the obligations of WHC to the Halsen Executives thereunder, are avoidable under 11 U.S.C. §§ 544 and 548, 6 Del. Code § 1304 and 1305, and California Civil Code §§ 3439.04 and 3439.05.

178.    Accordingly, each of the Halsen Executive Claims must be disallowed because the Severance Agreements upon which they are based are unenforceable against the debtor and property of the debtor under applicable law for a reason other than because such claim is contingent or unmatured.

179.    At the time that the Severance Agreements were executed, each of the Halsen Executives was an insider of WHC. The Severance Agreements were insider transactions, without independent oversight.

180.    The Severance Agreement imposed on WHC $3 million of new obligations to insiders without consideration. In fact, on information and belief, the Halsen Executives recognized that, because WHC was in default under the MPT Loan, there was a significant likelihood that MPT would exercise its proxy rights to remove them from their positions as officers and members of WHC's board, and therefor executed the Severance Agreements in an effort to both (a) deter their removal and (b) line their own pockets on the way out, rather than in exchange for any new services

of value.  Accordingly, each of the Halsen Executive Claims must be disallowed because they are each a claim for services of an insider of the debtor that exceed the reasonable value of the services provided in exchange.

181.   Each of the Halsen Executive Claims must also be disallowed because they are each the claim of an employee for damages resulting from the termination of an employment contract, and, in each case, the claim seeks amounts exceeding the compensation provided by such contract, without acceleration, for one year following the date on which the employer directed the employee to terminate performance under such contract.

182.   In addition, execution of the Severance Agreements violated Sections 5 and 10 of the Subordination Agreement by increasing the compensation payable to the Halsen Executives during pendency of an event of default under the MPT Secured Financing.

183.   Accordingly, for each of the reasons described in the preceding paragraphs, the Halsen Executive Claims should each be disallowed in their entirety.

### TWELFTH CAUSE OF ACTION
**Equitable Subordination of the Halsen Executive Claims**
**Under 11 U.S.C. § 510(c)**
**(Against Halsen Executives)**

184.   The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

185.   Pursuant to Section 510(c) of the Bankruptcy Code, after noticing and a hearing, the Court may, under principles of equitable subordination, subordinate for purposes of distribution all or a part of an allowed claim to all or part of another allowed claim.

186.   Each of the Brothman Claim, Fowler Claim and King Claim assert proofs of claims against WHC in connection with the Severance Agreements.

187.   The Severance Agreements were insider transactions, without independent oversight, that were anything but fair and arms' length.

188.     The Halsen Executives' decision to cause WHC to enter into the Severance Agreements was a violation of their fiduciary duties to WHC and its creditors, intended to unfairly enrich themselves, and exacerbated WHC's insolvency, to the detriment of its other creditors.

189.     On information and belief, the Halsen Executives recognized that, because WHC was in default under the MPT Loan, there was a significant likelihood that MPT would exercise its proxy rights to remove them from their positions as officers and members of WHC's board, and therefor executed the Severance Agreements in an effort to both (a) deter their removal and (b) line their own pockets on the way out.

190.     Execution of the Severance Agreements violated Sections 5 and 10 of the Subordination Agreement executed in connection with the MPT Secured Financing by increasing the compensation payable to the Halsen Executives during pendency of an event of default under the MPT Secured Financing.   The allowance of any claim to the Halsen Executives would be inequitable to, among other creditors, MPT, because MPT's deficiency claim in the Chapter 11 Cases is structurally subordinated under the Plan to other general unsecured claims until the holders of such claims have received an aggregate distribution in excess of a threshold amount.  As of the filing of this Complaint, such threshold has not been met.  Accordingly, allowing the Halsen Claim would effectively allow the Halsen Executives to be paid amounts under the Severance Agreements ahead of MPT despite the clear intent of the Subordination Agreement to the contrary.

191.     For the reasons described in more detail in the previous paragraphs, principles of equitable subordination, require the subordination of the Halsen Executive Claims to the prior payment of all other general unsecured claims in the Debtors' estates.

192.     Accordingly, and pursuant to Sections 510(c) of the Bankruptcy Code, each of the Brothman Claim, the Fowler Claim, and the King Claim should be contractually, and equitably, subordinated to prior payment in full of all other general unsecured claims against the Debtors' estates and the Trust.

## VI.      PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeremy Rosenthal, solely in his capacity as Liquidation Trustee for the WHC Liquidation Trust, prays for relief as follows:

A.      Entry of judgment in favor of the Trustee and against each of the Defendants avoiding and recovering the Transfers, in an amount to be determined at trial;

B.      The entry of a judgment in favor of the Trustee and against Defendants Daniel Brothman, Stacy Sean Fowler and Edmund C. King holding them liable for their breaches of fiduciary duty, in an amount to be determined at trial;

C.      The entry of a judgment in favor of the Trustee and against each of the Defendants holding them liable for aiding and abetting the breaches of fiduciary duty by Brothman, Fowler and King;

D.      The entry of a judgment declaring that (a) the Halsen Executives and Halsen Holdings, (b) Fowler and South Texas Associates, and (c) King and Peninsula Healthcare are each alter egos of each other and piercing their respective corporate veils;

E.      The entry of a judgment in favor of the Trustee and against each of the Defendants the extent that they were unjustly enriched at the expense of the Debtor;

F.      An award of reasonable attorneys' fees and costs;

G.      An award of pre- and post-judgment interest;

H.      Disallowance of Defendants' claims;

I.      Permission to amend Debtor's pleadings to conform to the evidence at trial; and

J.      Such further and equitable relief as the Court deems just and equitable.

## VII.     DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by jury as allowed by law.

1

2     DATED:  December 1, 2023              **PERKINS COIE LLP**

3                                          By: _____*/s/ Paul S. Jasper*_____
                                              Paul S. Jasper, Bar No. 200138

4                                          Amir Gamliel, Bar No. 268121
5                                          PERKINS COIE LLP
                                           505 Howard Street, Suite 1000
6                                          San Francisco, CA  94105
                                           Telephone:    415.344.7000
7                                          Email:  PJasper@perkinscoie.com
                                                       AGamliel@perkinscoie.com

8                                                       and

9                                          Andrew H. Sherman (admitted *pro hac vice*)
10                                         Boris I. Mankovetskiy (admitted *pro hac vice*)
                                           SILLS CUMMIS & GROSS P.C.
11                                         One Riverfront Plaza
                                           Newark, New Jersey 07102
12                                         Telephone:    973.643.7000
                                           Facsimile:    973.643.6500
13                                         Email:    ASherman@sillscummis.com
                                                       BMankovetskiy@sillscummis.com

14                                         *Co-Counsel to the WHC Liquidation Trust*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
**EXHIBIT A**
3
**All Transfers**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**Four Year Transfers**

1

**EXHIBIT C**

**Two Year Transfers**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT D**

**Employment Contract Transfers (Two Years)**

1

**EXHIBIT E**

2

**Preferential Transfers**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT F**

**Corporate Organization Chart**

**EXHIBIT G**

**Living Expenses (Four Years)**